**CHRYSLER CORPORATION, a corporation of the State of Delaware, Plaintiff,**

v.

**NEW CASTLE COUNTY, a municipal corporation of the State of Delaware, Defendant and Third-Party Plaintiff,**

v.

**The CITY OF NEWARK, a municipal corporation of the State of Delaware, Third-Party Defendant.**

Superior Court of Delaware,
New Castle County.

Submitted: Feb. 25, 1983.

Decided: June 8, 1983.

Edward M. McNally (argued), P. Clarkson Collins, Jr., and Scott A. Green, of Morris,

James, Hitchens & Williams, Wilmington, for plaintiff.

Stephen J. Rothschild (argued), of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for defendant and third-party plaintiff.

Thomas G. Hughes (argued), of O'Donnell & Hughes, P.A., Wilmington, for third-party defendant.

CHRISTIE, Justice: *

This case involves an action by Chrysler Corporation against New Castle County in connection with sewer fees. Chrysler entered into an agreement in 1951 under which Chrysler contributed funds to the County toward the construction of a sewer line to the City of Newark, Delaware. The County, in turn, agreed to limit the sewer service charge which it was to collect from Chrysler. The County further agreed that, in the event the sewer line was turned over to Newark, Chrysler would not be liable for a sewer charge greater than that paid by Newark to the County for sewer services rendered in Newark. Chrysler seeks a declaratory judgment that the County must abide by its agreement and a money judgment for what was alleged to be past overcharges.

The County denies any breach of its agreement with Chrysler and has filed a third-party complaint against Newark, seeking to hold Newark liable for any sums which may be adjudged to be due Chrysler from the County. Newark, in turn, has denied any liability to the County on account of sewer charges collected from Chrysler and has raised several affirmative defenses. No complaint has been filed against Newark by Chrysler. Therefore, Newark can be held liable (if at all) in this case only if the County is first held liable to Chrysler.[1]

---

* Specially assigned to Superior Court under Del. Const. art. IV, § 13(2), by Order of the Chief Justice dated April 5, 1983.

1. Newark has already settled with Chrysler on the basis of a 1979 opinion in *City of Newark v.*

Chrysler and Newark have both moved for summary judgment.

## FACTS

In an attempt to cope with the sewage disposal problem in New Castle County in the late 1940's, the Delaware General Assembly passed legislation granting the County broad authority to take the necessary steps to treat and dispose of sewage. The enabling statutes gave the County power to enter into contracts with industrial establishments for the disposal of sewage, to accept contributions toward the construction of sewers, and to contract with any city or town located within the County for the disposal and treatment of sewage. *See* 9 *Del.C.* § 2202(3); 9 *Del.C.* § 2202(6); 9 *Del.C.* § 2215. The County proceeded to contract with municipalities and industrial establishments for construction of a County sewage disposal system. *See e.g., New Castle County v. Mayor and Council of New Castle,* Del.Supr., 372 A.2d 188 (1977).

In 1951, as part of its comprehensive plan, the County began negotiation with Newark and four industrial concerns with plants within the City of Newark. The four industrial establishments were Chrysler, National Vulcanized Fibre Corporation (NVF), E.I. duPont de Nemours & Co., and Curtis Paper Company. The subject of the negotiations was an interceptor trunk line to serve the Newark area. This line was known as the North Christina Interceptor.

As a result of these negotiations, Chrysler entered into an agreement with the County on October 2, 1951. Under the terms of the agreement, Chrysler agreed to contribute $200,000 toward the construction of the sewer line and to:

(3) Pay to [the County] an annual sewer service charge at the usual County rate if as and when such annual service charge

---

*NVF,* discussed extensively in this opinion. Newark's continuing interest in this proceeding is limited to its effort to avoid liability for any additional damages which may be found to be due from the County to Chrysler.

may be fixed and put into effect by [the County].

However, the County agreed that:

(3) If, after [the County] shall have deeded any part of the extension of the North Christina Interceptor to the City of Newark, and if Chrysler will be then connected directly to such part of said interceptor, Chrysler will be excused from the payment of any further annual sewer service charges to [the County], but will be liable to pay to the City of Newark its usual sewer service charges. Provided, however, Chrysler shall not be required to pay to the City of Newark an annual sewer service charge on a schedule having charges greater than that paid by the City of Newark to [the County], based on the volume of sewage measured by approved sewage meters installed by Chrysler on their property.

On November 20, 1951, the County and Newark entered into an agreement which provided that Newark would assume ownership and control of those portions of the sewer line which were to lie within the territorial limits of Newark and a short distance beyond. Newark agreed to pay $18,000 toward the cost of construction of the North Christina Interceptor. In return, the County agreed to dispose of the sewage carried in the sewer line for a charge based upon the actual flow of sewage. Newark was permitted to charge its users subject to the provision that:

6. Newark may collect sewer service charges for residential, commercial, industrial or other properties discharging into these sewers at a rate to be established by the City Council. Such sewer charges on any real property located outside of the corporate limits of the City of Newark shall not be other than the usual County sewer service charge as fixed and determined from time to time by [the County], *nor shall such sewer service charges to Chrysler Corporation, E.I. duPont deNemours & Co., Curtis Paper Company and National Vulcanized Fibre Company be other than the usual County*

*sewer service charge as fixed and determined from time to time by [the County], the aforesaid Corporations having contributed to the construction cost of said sanitary interceptor sewer.* [Emphasis added.]

On May 27, 1952, NVF signed an agreement with the County which formalized an October 1951 letter of intent to contribute $20,000 toward construction of the sewer line. NVF agreed to:

3. Pay to [the County] an annual sewer service charge at the usual County rate based on its actual discharge of sewage into said sewer but never at any time in excess of the lowest rates then being charged by [the County] for like service.

However, the parties also agreed that:

2. If [the County] shall have transferred any part of said sanitary interceptor trunk sewer to Newark, and if [NVF] shall then be connected directly to such part of said sewer, [NVF] shall be excused from the payment of any further annual sewer service charge to [the County] and will be liable to pay to Newark its usual sewer service charge provided, however, that [NVF] shall not be required to pay to Newark an annual sewer service charge on a schedule having charges greater than that paid by Newark to [the County].

The interceptor line was then constructed and Newark assumed its responsibilities under its agreement with the County. For nearly twenty years thereafter, the County charged Newark and industries located outside of Newark, industries similar to NVF and Chrysler, the same rate.

In 1972, the United States Congress enacted the Clean Water Act, 33 U.S.C. 1251 *et seq.*, which imposed stricter water pollution control standards than those enforced by the County at that time. As a result, the County was required to construct new sewage treatment facilities. To help offset the great cost of the new construction, the County sought federal and state financial aid. As a prerequisite to receiving federal funds, the federal regulations required the

County to develop a user service charge system which took into account, among other things, the services which a wholesale customer, such as Newark, was already providing to the system.[2] The County states that without this new rate structure, federal funds would not have been available for construction of the improved sewage treatment facilities.[3]

As a result of these federal regulations, the County changed its fee structure. Newark also restructured its rates and began charging industrial customers the "Newark/Industrial Rate". This new rate exceeded the rate the County charged Newark and also exceeded the rate the County charged industrial users outside the City of Newark.

## PRIOR LITIGATION

No controversy arose until 1976 when NVF discovered that it was being charged a rate which was not in accord with its agreement with the County. NVF then refused to pay the fees which exceeded the limitation of that agreement. Newark, in turn, filed suit in the Court of Chancery against NVF[4] and NVF filed a third-party complaint against the County for alleged overcharges.

Since the contracts and contentions in the case now before the Court correspond in many respects to those before the Vice Chancellor in the *NVF* litigation, the significance and application of the opinions of the Vice Chancellor in the NVF litigation will be discussed in some detail here.

Since most of the facts before the Court of Chancery were not in dispute, Newark and NVF each filed motions for summary judgment. The dispute involved the possible application of three sewer rates:

1. The rate then being charged by Newark to industrial users located within Newark (the Newark/Industrial Rate) which was 79¢ per thousand gallons at the time the suit was filed;

2. The rate charged by the County to industrial users located outside Newark (the Industrial Rate) which was 61¢ per thousand gallons;

3. The rate charged by the County to Newark (the Municipal Rate) which was 40.9¢ per thousand gallons.

Newark requested that the Vice Chancellor affirm its right to charge the highest rate, the Newark/Industrial Rate. NVF, a third-party beneficiary of the 1951 agreement between Newark and the County, argued that that agreement limited the rate Newark could charge to the lowest rate—the Municipal Rate. The County, as a third-party defendant, elected not to independently brief the issue, and it waived "the right to be subsequently heard, either factually or legally, on any matter which forms any part of the basis on which summary judgment might hereafter be granted in favor of the City of Newark and against NVF." *City of Newark v. NVF Company,* Del.Ch., C.A. No. 5716 (Brown, V.Ch., Mar. 2, 1978). Newark fully briefed and argued the issue.

The Court of Chancery then held that the 1951 agreement between Newark and the County was valid and enforceable, and that such agreement prevented Newark from collecting more than the "usual County sewer service charge". The Court went on to equate usual County sewer service charge with the middle rate listed above—

2. The County contends that this requirement is one of the reasons for a lower sewer rate for Newark. Newark, a wholesaler, bills and collects charges for sewer use within its boundaries. The County notes that the industrial users provide no corresponding services for the County system.

3. The Environmental Protection Agency's regional administrator may not "pay more than 50 percent of the Federal share of any [construction project] ... unless the grantee has submitted adequate evidence of timely development of its system of user charges, nor shall the Regional Administrator pay more than 80 percent of the Federal share unless he has approved the system." 40 C.F.R. 335.935–13(a)(1) (1982).

4. *See City of Newark v. NVF,* Del.Ch., C.A. No. 5716 (Brown, V.Ch., Mar. 7, 1978).

the Industrial Rate (not the Municipal Rate for which NVF had argued). The Court further found that since Newark was not a party to the later, 1952 NVF/County agreement which specified that NVF was to get the benefit of what we now call the Municipal Rate, Newark could not be bound by that agreement. See the unreported opinion in *City of Newark v. NVF Company,* Del.Ch., C.A. No. 5176 (Brown, V.Ch., Jan. 10, 1979). Thus, the Court did not grant the precise remedy requested by either Newark or NVF.

NVF, in a continuing attempt to secure the Municipal Rate for which it had bargained, pursued its third-party claim against the County for the breach of the 1952 NVF/County agreement. NVF took the position that the County breached its promise that NVF would not be required to pay to Newark a rate higher than the rate Newark paid to the County. The Vice Chancellor then rendered a second unreported opinion in which he held that in the 1952 agreement the County had obligated itself to see that NVF's sewer charges did not exceed the Municipal Rate. Therefore, he granted summary judgment to NVF and found the measure of damages to be the difference between the Municipal Rate specified in the 1952 NVF/County agreement and the Industrial Rate specified in the 1951 Newark/County agreement. *See City of Newark v. NVF,* Del.Ch., C.A. No. 5176 (Brown, V.Ch., Jan. 10, 1980), *aff'd mem.,* Del.Supr., 435 A.2d 1043 (1980).

### PRESENT LITIGATION

In the present suit, Newark and Chrysler have filed separate motions for summary judgment against the County, contending that the interpretations of the contracts at issue in this litigation are controlled by the *City of Newark v. NVF* decisions. They argue that as a result of those prior rulings and the application of collateral estoppel, the County is not now permitted to deny that it alone is liable to Chrysler for sewer fees Chrysler has paid in excess of the

Municipal Rate but below the Industrial Rate.

The County opposes the granting of these motions and contends that collateral estoppel cannot be used here since the prior litigation is distinguishable. The County says that, under the circumstances, it would be unfair to estop the County on the basis of those prior holdings. Additionally, the County seeks to amend its pleading to reflect an alternate defense of impracticability of performance as to the contracts. It claims that the addition of this factual issue would preclude a grant of summary judgment for either party.

The collateral estoppel arguments fall into two categories, reflecting the differing positions of the proponents. Newark seeks a defensive use of the doctrine, relying on the 1979 opinion as a shield from any liability to Chrysler beyond the guarantee of the Industrial Rate (the basis on which it has already settled with Chrysler). Chrysler makes offensive use of the doctrine, using the 1980 opinion to which it was not a party, in two ways: to cut down the County's defenses regarding its contractual responsibilities and to assure that Chrysler, (as a plaintiff), has a right to look to the County for redress on the basis of the County's agreement that Chrysler will have to pay no more than the Municipal Rate. Finally, the unpleaded but adequately briefed issue of impracticability will be addressed.

### I. DEFENSIVE COLLATERAL ESTOPPEL

■ Newark's defensive assertion of collateral estoppel is one which finds clear application in Delaware law. The older rule on the use of this doctrine required that mutuality of estoppel must exist in the current litigation: without mutuality, a party was precluded from using the prior determination as a bar. *See generally* Annot., 31 A.L.R.3d 1044 (1970). However, the modern trend of decision, and the rule in this jurisdiction, expands the use of the doctrine to situations where mutuality does not exist.

In the case of *Coca-Cola Co. v. Pepsi-Cola Co.*, Del.Super., 172 A. 260 (1934), the plaintiff filed an action in the Court of Chancery against two defendants. The case was tried on the merits and dismissed. The plaintiff then filed a corresponding action in the Superior Court against a defendant which had not been a party in the prior Chancery suit. The issues to be litigated were found to be identical. Superior Court held that plaintiff was barred from relitigating the same issues even though the new suit was against a stranger to the first suit. Judge Rodney found that the doctrine of *res judicata*[5]

> draws its strength not so much from the private advantage of the party seeking to invoke it, but its roots lie in the principle that public policy and welfare require a definite end to litigation when each of the parties has a full, free and untrammelled opportunity of presenting all of the facts pertinent to the controversy. The primary object of res judicata (public policy) is based upon the maxim republicae ut sit finis litium—it concerns the commonwealth that there be a limit to litigation.

> \* \* \* \* \* \*

> But assuming the identity of issues, we are of the opinion that a plaintiff who deliberately selects his forum and there unsuccessfully presents his proofs, is bound by such adverse judgment in a second suit involving all the identical issues already decided. The requirements of mutuality must yield to public policy. To hold otherwise would be to allow repeated litigation of identical questions, expressly adjudicated, and to allow a litigant having lost on a question of fact to re-open and re-try all the old issues each time he can obtain a new adversary not in privity with his former one.

*Id.* at 262–63. *See Foltz v. Pullman, Inc.*, Del.Super., 319 A.2d 38, 40–41 (1974); *see also Tyndall v. Tyndall,* Del.Supr., 238 A.2d 343 (1968); *Bata v. Bata,* Del.Supr., 163 A.2d 493 (1960). Thus, in this jurisdiction, when an issue of fact which was necessary to the outcome of a valid prior judgment has been fully litigated, it may not be reargued by a party to that prior proceeding.

The Newark/County agreement, in the context of NVF's defense against Newark's claim for damages, was the pivotal subject of the NVF 1979 opinion. The County was a third-party defendant in the *NVF* litigation and was not, therefore, in actual opposition to the plaintiff, Newark. Thus, traditional mutuality does not exist between Newark and the County here. However, because Newark fully litigated the issue of the Newark/County contract and since the County waived its right to argue that issue and agreed to be bound by the Vice Chancellor's 1979 ruling, the rule applied in *Coca-Cola Co. v. Pepsi-Cola Co.* applies here.

The County argues that it is unfair to invoke the Vice Chancellor's interpretation of the Newark/County agreement against it here to relieve Newark of any liability for amounts it might otherwise be found to owe to Chrysler because the County's agreement with Chrysler (unlike the NVF agreement) predated the Newark/County contract.[6] The County contends that this fact is significant because in *City of Newark v. NVF Co.,* the Vice Chancellor held that Newark was not bound by the terms of the NVF agreement because Newark was not a party to that prior agreement.

I find that the difference only serves to make Chrysler's position stronger. That the Newark/County agreement was not interpreted so as to be consistent with the conditions of the later NVF/County agreement may have benefited Newark, but it

---

5. The terms *res judicata* and *collateral estoppel* have often been used interchangeably in this jurisdiction. For an explanation of actual distinctions between them, *see Foltz v. Pullman, Inc.,* Del.Super., 319 A.2d 38, 40 (1974).

6. The Chrysler/County contract was executed in October, 1951, the Newark/County contract was executed in November, 1951, and the NVF/County contract was executed in May, 1952, although a letter of intent from NVF was secured in October, 1951.

cannot help the County. If the County's logic is to be accepted, the Newark/County agreement, executed in this case after the Chrysler/County contract, should be viewed in light of the obligation the County had already made to guarantee the lower Municipal Rate to Chrysler.

The Vice Chancellor underscored the significance of a similar argument made by the County in the 1980 proceeding. He noted that the County signed the Newark/County agreement after it had negotiated with NVF in 1951 to receive a letter of intent but before it concluded the formal NVF contract in 1952. The Vice Chancellor remarked that if hardship existed as a result of the differing contracts "it was due to the County's own act in binding itself to Newark in 1951 to something different than was offered to and accepted by NVF under the 1952 agreement." He went on to say:

> Here, the County is attempting to rely upon its own voluntary act occurring between its negotiations with NVF and NVF's 1951 letter of intent and its 1952 agreement with NVF, as excusing it from its performance of what it promised NVF in the event that control of the interceptor was transferred to Newark.

*City of Newark v. NVF Company,* Del.Ch., C.A. No. 5176 (Brown, V.Ch., Jan. 10, 1980).

The Vice Chancellor's reasoning does not lose its thrust here on account of the sequence of the Chrysler/County and the Newark/County agreements. The County acted knowingly in 1951 and cannot now be heard to argue that the effect of its later voluntary choice was to limit the rights it created in the Newark/County agreement.

Thus, the County is estopped from contending that Newark has any liability for the alleged damages Chrysler is demanding in this case.

## II. OFFENSIVE COLLATERAL ESTOPPEL

█ Chrysler's claims in respect to its contract with the County raise somewhat different issues. Newark sought rulings corresponding to those made by the Vice Chancellor in the 1979 opinion in regard to the Newark/County agreement in order to defend against the third-party complaint brought against it by the County. However, Chrysler's use of collateral estoppel advances its claim as a plaintiff and differs from the traditional defensive use of the doctrine. It asserts that the Vice Chancellor's 1980 rulings on the County's duties under the NVF/County agreement are also applicable to the County's duties under the Chrysler/County agreement since the NVF/County and the Chrysler/County agreements are virtually identical.

Chrysler relies on *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), as support for its position that offensive use of collateral estoppel in appropriate cases is fair and in accord with the basic purpose of the doctrine, protecting litigants "from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by prosecuting needless litigation." *See Id.* at 439 U.S. at 326, 99 S.Ct. at 649.

In *Parklane Hosiery Co. v. Shore,* the plaintiff brought a shareholder's class-action suit in federal court against a corporation, its officers, and directors, alleging violation of various federal security laws and regulations in regard to a proxy statement. The suit was stayed while the Securities and Exchange Commission sought an injunction and declaratory relief in District Court against the same defendants, alleging that the proxy statement issued by defendants was false and misleading in essentially the same respects as the plaintiffs claimed. The District Court entered judgment in favor of the SEC. The shareholders, as plaintiffs in the class action, then moved for partial summary judgment, asserting that defendants were collaterally estopped from relitigating the issues which had already been resolved against them in the SEC suit. The Supreme Court held that defendants who had a full and fair opportunity to litigate their defenses in a prior action are collaterally estopped from relitigating the

same issues against a different adversary. 439 U.S. at 332, 333, 99 S.Ct. at 652.

The Court noted the existence of four considerations which might mitigate against the adoption of offensive use of collateral estoppel:

(1) It does not promote judicial economy in the same manner as defensive use. A plaintiff does not have as strong an incentive to join all defendants in the first action since offensive use encourages the adoption of a "wait and see" attitude.

(2) If in the first litigation the damages are small or if other suits are unforeseeable, the defendant may have little incentive to vigorously defend.

(3) The judgment relied upon could be inconsistent with other judgments favorable to the defendant.

(4) The second litigation could present procedural opportunities absent in the first which could cause a different result in the second.

*Id.* at 439 U.S. at 329–31, 99 S.Ct. at 650–51. The Court also cautioned that there may be other unspecified fairness considerations militating against offensive use.

However, the Court determined that offensive collateral estoppel was permissible, but that the trial courts should be granted broad discretion to determine when it would be applicable.

The general rule should be that in cases where a plaintiff could easily have joined in the earlier action and where, either for the reasons ... discussed or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

*Ibid.* at 439 U.S. 331, 99 S.Ct. 651–52.

The County raises three arguments against the application of offensive collateral estoppel in this case:

First, it argues that the decision in *Parklane Hosiery Co. v. Shore* is not binding upon Delaware courts and has not been followed in other jurisdictions. However, even though the federal rule does not control the practice in our courts, it would appear that Delaware precedent indicates a trend in support of a broadening use of collateral estoppel. In 1934, the requirement of mutuality was rejected on a public policy rationale when a "full, free and untrammelled opportunity" to present all the facts had been afforded. *Coca-Cola Co. v. Pepsi-Cola Co.,* 177 A. at 262; *see also Foltz v. Pullman, Inc.,* 319 A.2d at 41. It appears to me that judicious use of offensive collateral estoppel is in accord with Delaware's established policy to promote judicial economy.

It is also to be noted that the jurisdictions in which the courts do not permit the use of offensive collateral estoppel are now in the minority, and that the courts which do not allow its use tend to rely upon the absence of mutuality as a basis for prohibiting offensive collateral estoppel. *See* Annot: 31 A.L.R.2d 1044 (1982 Supp.); *see also* cases collected in *Restatement (Second) of Judgments* § 29 at 298 (Reporter's Notes) (1982). Since it was long ago decided in Delaware that lack of mutuality does not preclude the use of collateral estoppel, there is no sound reason to find other excuses to avoid its application.

Second, the County contends that it was unaware of the "dramatic shift away from mutuality inaugurated by the *Parklane Hosiery* decision" when it waived its right to be heard on the interpretation of the Newark/County contract. In light of the fact that *Coca-Cola Co. v. Pepsi Cola Co.* was decided in 1934, this claim is not persuasive.

Third, the County argues that the *Parklane Hosiery Co. v. Shore* decision was one of qualified approval and the application of collateral estoppel would work unfairness in this particular suit. This final, broad contention of unfairness, examined in light of the considerations posed by the court in *Parklane Hosiery Co. v. Shore,* is not persuasive. It is apparent, in the absence of any evidence to the contrary, that the claim that Chrysler adopted an improper "wait and see" attitude (so as to have the benefit

of any ruling in favor of NVF without warning the County of its secret designs) cannot be maintained. Furthermore, it was the County which signed agreements with five parties regarding the North Christina Interceptor, and a suit by each party to which the County made corresponding promises was reasonably foreseeable. The County, therefore, had sufficient incentive to vigorously defend its position as a third-party defendant in the *NVF* litigation. Additionally, there are no inconsistent judgments in regard to the contracts at issue

here, and there are no procedural opportunities presented here which were not available to the County in the prior litigation.

We turn then to the issue of the overall fairness, or lack thereof, in the use of collateral estoppel here. In this context, the County argues that there are significant differences in the NVF/County and the Chrysler/County contracts which would make it unfair to allow the interpretation of the former contract to control the interpretation of the latter contract. The pertinent sections of these contracts are:

### NVF/COUNTY CONTRACT

2. If [the County] shall have transferred any part of said sanitary interceptor trunk sewer to Newark and if National shall then be connected directly to such part of said sewer, National shall be excused from the payment of any further annual sewer service charge to [the County] and will be liable to pay to Newark its usual sewer service charge provided, however, that *National shall not be required to pay to Newark an annual sewer service charge greater than that paid by Newark to [the County].* (Emphasis added.)

### CHRYSLER/COUNTY CONTRACT

3. If, after [the County] shall have deeded any part of the extention of the North Christina Interceptor of the City of Newark, and if Chrysler will be then connected directly to such part of said interceptor, Chrysler will be excused from the payment of any further annual sewer service charges to [the County], but will be liable to pay to the City of Newark its usual sewer service charges, provided, however, *Chrysler shall not be required to pay to the City of Newark an annual sewer service charge on a schedule having charges greater than that paid by the City of Newark to [the County],* based on the volume of sewage measured by approved sewage meters installed by Chrysler on this property. (Emphasis added.)

I find no significant difference in the operative language of the contracts. This is as one would expect since the agreements are with a government agency and they appear to be the product of almost simultaneous negotiations with industries similarly situated concerning the same project. I attach no importance to the slight variation in the wording.

The County also cites *Commissioner of IRS v. Sunnen,* 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948) for the proposition that a court is free to make an independent examination of an instrument which is identical to, but executed separately from, one in an earlier proceeding. That case involved the tax status of certain income generated by a license agreement during a particular time period. The Court did not apply collateral

estoppel because several years separated the first action from the one then before it, and the controlling legal principles were found to have changed in the interim. *See Montana v. U.S.,* 440 U.S. 147, 161, 99 S.Ct. 970, 977, 59 L.Ed.2d 210 (1979). Here, there is no similar intervening change mitigating against the use of collateral estoppel.

I conclude that the Vice Chancellor's 1980 ruling interpreting the meaning of the operative words in the NVF/County contract is determinative here. Neither the words of caution found in the *Parklane Hosiery Co. v. Shore* decision nor the general fairness arguments advanced by the County preclude the use of offensive collateral estoppel in this case. The County is estopped from arguing that it is not liable to Chrys-

ler under the Chrysler/County contract for fees Chrysler paid in excess of the Municipal Rate which the County had promised Chrysler.

### III. IMPRACTICABILITY

In its remaining defense the County alleges that summary judgment does not lie because it has raised an issue of fact as to whether the performance of the 1951 contracts has been rendered so impracticable by supervening federal legislation as to render the contracts unenforceable.[7] The County correctly contends that this issue was not fully litigated in the prior suits, and that it is not subject to collateral estoppel here. In view of this, the County seeks leave to amend its pleadings to add the affirmative defense of impracticability. Chrysler and Newark resist the motion to amend, and they point out that Superior Court Civil Rule 8 deems that defense waived since it was not pleaded.[8]

■■■ Under Superior Court Civil Rule 15 amendments to pleadings are to be fully allowed in the absence of prejudice to the opposing party.[9] *Annone v. Kawaski Motor Corp.,* Del.Supr., 316 A.2d 209, 211 (1974). Leave to amend after a responsive pleading has been filed is discretionary, *Mergenthaler, Inc. v. Jefferson,* Del.Supr., 332 A.2d

396, 398 (1975). However, in the absence of improper motives such as bad faith or dilatory tactics, delay alone is an insufficient reason to deny leave. *Hess v. Carmine,* Del.Super., 396 A.2d 173, 177 (1978). Although the issue of impracticability was not originally pleaded, it has been fully briefed and argued and no prejudice will accrue if leave is granted. The County will be regarded as having amended its pleadings, and the other parties will be assumed to have filed amended responses consistent with the positions taken in the briefs. Further delay for further discovery will not be allowed. The County's arguments based on impracticability in opposition to the summary judgment motion will be examined.

Chrysler and Newark have met their burden of supporting their motions for summary judgment. The collateral estoppel effect of the Court of Chancery's 1979 and 1980 decisions disposes of the County's defense on contract interpretation. Chrysler further points out that the County's belated affirmative defense is made up out of the "whole cloth", in that although numerous documents have been supplied to the Court by the parties there is not substantial evidence supporting the County's assertion that the loss of federal funds could not be avoided and that the County's prior com-

---

7. The County cites the excellent slip opinion in the case of *Freidco of Wilmington Delaware, Ltd. v. Farmers Bank,* D.Del., 499 F.Supp. 995 (1981) for the proposition that the defense of impracticability is an appropriate contract defense in this state. This Court does not find it necessary to decide that point. *See infra.*

8. Superior Court Civil RULE 8. GENERAL RULES OF PLEADING
    * * * * * *

    (c) *Affirmative Defenses.* In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, license, payment release, res judicata, statute of frauds, statute of limitations, waiver, *and any other matter constituting an avoidance or affirmative defense.* When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a

defense, the Court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation. [Emphasis added.]

9. Superior Court Civil RULE 15. AMENDED AND SUPPLEMENTAL PLEADINGS

    (a) *Amendments.* A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within 20 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the Court otherwise orders.

mitments really do render these contracts impracticable to enforce.

In a summary judgment motion, an opposing party cannot rest on mere allegations or denials. Superior Court Civil Rule 56(e).[10] See also 6 Moore's Federal Practice § 56.23. Once a motion is supported, an opposing party must demonstrate that there is a material issue of fact. *Moore v. Sizemore*, Del.Supr., 405 A.2d 679, 681 (1979). A claim which is not supported by relevant documentation "cannot be considered on face value alone. To do so calls for speculation and conjecture . . . . It is fundamental that a motion for summary judgment must be decided on the record presented and not on evidence potentially possible." *Rochester v. Katalan*, Del.Supr., 320 A.2d 704, 708, n. 7 (1974); *Bradford, Inc. v. Traveller's Indemnity Co.*, Del.Super., 301 A.2d 519, 522 (1972).

■ This Court has examined the material submitted and finds itself in agreement with Chrysler. The County asserts two premises for the impracticability argument: adoption of a user fee system was a precondition to receipt of federal funds for construction of sewage treatment facilities; to forego these funds would have created an unreasonable financial burden to the taxpayer. The County then immediately proceeds to a conclusion: performance of the Chrysler or Newark agreements threatens loss of federal funds and is unfair to other users.[11] However, this conclusion is not supported by any evidence establishing that there has been or is a real threat of loss of funds as a result of the user fee system instituted by the County.[12] Absent at least some factual evidence, the County's argument cannot withstand even limited scrutiny on a summary judgment motion. Additionally, there is no evidence that the County attempted to utilize administrative procedures available to it to blunt any potential deleterious effect of federal action. I find the defense of impracticability to be based on undocumented speculation.

The case cited by the County in support of this defense is not helpful. It cites the case of *Kansas City, Mo. v. Kansas City, Ka.*, W.D.Mo., 393 F.Supp. 1 (1975). In that suit a sewer service agreement provided free sewage treatment to one party. The District Court found that treatment without any charge violated the federal law. However, in this case the County has the clear right to charge user fees and to increase user fees. By prior contract it has merely undertaken to peg its fees to a flexible third-party standard.

The County cannot be heard to resist summary judgment on the basis that it needs more time to conduct discovery and

**10.** Superior Court Civil Rule 56

     *     *     *     *     *     *

    (e) *Form of Affidavits; Further Testimony; Defense Required.* Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The Court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or affidavits. When a motion for summary judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegation or denials of his pleading, but his response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial.

If he does not so respond, summary judgment, if appropriate, shall be entered against him.

**11.** The County explains unfairness only in terms of the allocation of costs. It does not examine the benefits which may flow from the enforcement of contracts which, in return for a small financial advantage, serve to benefit a local economy by drawing industry to a particular geographical area and keep it there.

**12.** Under the Clean Water Act, every recipient of waste treatment services is required to pay its proportionate costs. This is to ensure that every facility built with federal assistance will be self-sufficient. Although the federal government has the right to impair existing contractual obligations if the action is necessary to further public policy, there is no provision in the Clean Water Act that abrogates any contract. *City of New Brunswick v. Borough of Milltown*, 3d Cir., 686 F.2d 120, 133–34 (1982).

to develop this defense which it added to its answer so late in the proceeding. This argument has long been in contention between these parties even though not formally denominated in the pleadings. The County has had ample opportunity within the present proceeding to prepare. The complaint in this case was filed in 1981; it is now mid-1983. In fact, as long ago as 1975 this defense was raised by the County in under somewhat parallel circumstances. In that year, the City of New Castle brought an action in the Court of Chancery against the County regarding its sewer service charges. The City sought an injunction to prevent the County from charging fees in excess of those indicated in a 1950 agreement between the City and the County. It also sought a declaratory judgment regarding the validity of an agreement on sewer service charges similar to one of those at issue here. The County raised a defense of substantial change of circumstance, alleging that the passage of the Federal Water Pollution Control Act of 1972, 33 U.S.C. § 1251, created undue financial hardship on the County in enforcement of the contract.

During the three-year period consumed by that litigation, the County failed to produce any evidence supporting its contention. Finally, the Vice Chancellor granted summary judgment to New Castle, enforcing the contract, and finding that "in the absence of any factual record to support it, a claim or defense for such relief is obviously premature." See the unreported opinion in *The Mayor and Council of New Castle v. New Castle County,* Del.Ch., C.A. No. 4773 (Brown, V.Ch., Nov. 30, 1978).

In 1976, a similar argument was made in the *NVF* litigation, which was concluded in 1980. Newark, the party which argued against NVF's interpretation of the New-

ark/County contract, contended that the effect of the Federal Water Pollution Control Act Amendments of 1972 mitigated against enforcement of its contract. The County voluntarily waived the right to address this issue and agreed to abide by the Vice Chancellor's decision. The Vice Chancellor held that no evidence had been presented to support that claim. He again termed the argument "premature", and granted summary judgment to NVF. *See City of Newark v. NVF Company,* Del.Ch., C.A. No. 5176 (Brown, V.Ch., Jan. 10, 1979).

Now, several years later, for the third time, essentially the same defense is being raised by the County although it is put forward in somewhat different terms. Again, the County has provided no evidentiary support for this speculative claim. This pattern supports the conclusion that the County is raising a defense which remains, at best, premature.[13] Such an unsupported contention cannot withstand a summary judgment motion. *Moore v. Sizemore,* 405 A.2d at 681.

\*　　\*　　\*

The rulings in the 1979 and 1980 opinions of the Court of Chancery bind the County and create a collateral estoppel under which the County cannot dispute the validity of its promises and enforceability of the contracts at issue. Therefore, the County is liable in damages to Chrysler for the fees Chrysler must pay in excess of the Municipal Rate, and Chrysler is entitled to an appropriate declaration of its rights.

Summary judgment is granted in favor of Chrysler and Newark on the liability issues. Relatively minor disagreements appear to exist as to the calculation of the amount due Chrysler. Chrysler's damages will be considered further by the Court. Those parties are requested to prepare an appropriate order.

---

13. Another conclusion which might have been drawn from this pattern (but was not drawn) is that the County made a tactical decision to attempt to delay this litigation by raising an unpleaded argument in order to avoid summary judgment. If I were to have assumed that the belated argument of impracticability was a tactical maneuver, I would have had to deny the County leave to amend the pleadings because of bad faith, *Hess v. Carmine,* Del.Super., 396 A.2d 173, 177 (1978), and the impracticability argument would have been removed from the case, pursuant to Superior Court Rule 8.