Margaret S. BEATTIE, Plaintiff,

v.

Michael F. BEATTIE, Defendant,

and

Robert L. Boyles and Asplundh Tree Expert Co., a Pennsylvania corporation, Defendants/Third–Party Plaintiffs,

v.

Martin Chevrolet–Buick, Inc., a Delaware corporation, and General Motors Corporation, Third–Party Defendants.

C.A. No. 91C–12–141–JRS.

Superior Court of Delaware, New Castle County.

Submitted: Jan. 12, 2001.
Decided: Feb. 1, 2001.

Michael F. Bonkowski, Kimberly Gattuso, Saul Ewing LLP, Wilmington, Delaware, for Third Party-Plaintiffs, Asplundh Tree Expert Company and Robert L. Boyles.

Somers S. Price, Jr., Potter Anderson & Corroon, LLP, Wilmington, Delaware; Edward A. Gray, Michael P. Kinkopf, Lavin, Coleman, O'Neil, Ricci, Finarelli & Gray, Philadelphia, Pennsylvania, for Third-Party Defendants, Martin Chevrolet–Buick, Inc. and General Motors Corporation.

## MEMORANDUM OPINION

SLIGHTS, J.

### INTRODUCTION

The Court once again is called upon to delineate the bounds in Delaware of strict liability in tort for personal injury caused by allegedly defective products. The genesis of this dispute is an automobile accident that occurred on July 15, 1991, when a vehicle operated by Michael Beattie ("Beattie") collided with the rear of a truck owned by the Asplundh Tree Expert Company ("Asplundh") and operated by Robert L. Boyles ("Boyles"). Margaret Beattie, Michael Beattie's wife, occupied the rear center seat of the vehicle and suffered serious injuries in the accident. Third-party defendant, Martin Chevrolet–Buick, Inc. ("Martin Chevrolet"), employed Michael Beattie as a car salesman. Martin Chevrolet supplied a "demonstrator vehicle" to each member of its sales staff, including Beattie, as a perquisite of employment. Beattie was operating his demonstrator vehicle at the time of the accident.

Margaret Beattie initiated this action against her husband (Beattie), Asplundh, and Boyles. Asplundh and Boyles, in turn, filed a third-party complaint against Martin Chevrolet and General Motors Corporation ("General Motors") for contribution and indemnification. Mrs. Beattie settled her claims against the defendants leaving only Asplundh's and Boyles' third-party claims unresolved. The gravamen of the third-party claim at issue is that Martin Chevrolet, as a lessor of Beattie's demonstrator vehicle, is strictly liable for alleged defects in the design of the vehicle's passenger restraint system.[1] Martin Chevrolet has moved for summary judgment on the ground that the strict liability claim fails to state a cause of action as a matter of Delaware law because Martin Chevrolet was neither a lessor nor a bailor of the vehicle involved in the accident.[2]

---

1. The claims against General Motors are grounded in negligence and breach of warranty. These claims are not at issue in the motion *sub judice.* General Motors has agreed to indemnify Martin Chevrolet with respect to the strict liability claim.

2. Both parties predicate their arguments on the notion that Delaware courts will recognize the doctrine of strict liability only in the context of defective products distributed for public consumption by means of a lease or bailment transaction. *See Martin v. Ryder*

To resolve this motion for summary judgment, the Court must determine whether the transaction which transferred possession of the demonstrator vehicle from Martin Chevrolet to Beattie is the sort of transaction which will give rise to strict liability in tort. Specifically, the Court must consider whether a car dealership can be strictly liable for defects which exist in demonstrator vehicles it supplies to its employees for the purpose of promoting the sale or lease of such vehicles or other similar vehicles. The issue is one of first impression in Delaware.

For the reasons that follow, the Court concludes: (i) the transaction reflected in the Demonstrator Agreement is neither a lease nor a bailment; and (ii) Martin Chevrolet, nevertheless, may be held strictly liable for defects in demonstrator vehicles it supplies to its sales staff as a means of promoting either the use or consumption of its vehicles for sale or lease. Accordingly, Martin Chevrolet's motion for summary judgment must be **DENIED.**

### FACTS

On July 15, 1991, while traveling southbound on Delaware Route 1, Michael Beattie drove a 1991 Oldsmobile Cutlass Supreme into the rear of an Asplundh spray truck which was engaged in a spraying operation in the left-hand lane of the roadway. With Beattie were his wife, Margaret, seated in the middle rear seat, and his son, Alexander, seated in the right rear seat. Mrs. Beattie was secured in the vehicle by a lap belt restraint system.

This system allegedly was inadequate to protect Mrs. Beattie from serious injury in that she was propelled to the front of the vehicle compartment during the accident while still wearing her lap seat belt. It is alleged that the vehicle should have been equipped with a shoulder harness in the rear center seat.

The vehicle Beattie was operating at the time of the accident was supplied to him by Martin Chevrolet pursuant to a demonstrator vehicle program. The program was governed by a Demonstrator Agreement, the relevant provisions of which provided:

1. The demonstrator vehicle was provided "in consideration of employment";

2. The demonstrator vehicle was not to be used for personal errands, vacations, etc.;

3. The demonstrator vehicle was to be operated only by the employee (no family, friends, etc. were to operate the vehicle);

4. The employee was responsible for all repairs on the demonstrator vehicle beyond those necessitated by "normal wear and tear";

5. The employee was to "furnish oil and gasoline" for the demonstrator vehicle;

6. Martin Chevrolet was to supply liability, collision and comprehensive insurance coverage on the demonstrator vehicles, but the employee was responsible for insurance deductibles;[3]

7. The employee was to furnish the demonstrator vehicle to customers for

---

_Truck Rental, Inc._, Del.Supr., 353 A.2d 581 (1976).

**3.** The record reflects that Martin Chevrolet would deduct twenty dollars ($20) per week from an employee's salary to pay for insurance premiums, and two dollars ($2) per week for a "general repair" fund. If an employee sold nine (9) cars or more in a month,

Martin Chevrolet would reimburse the employee eighty dollars ($80) of the eighty eight dollars ($88) which had been deducted from the employee's pay during the month. The undisputed purpose of this component of the demonstrator program was to motivate employees to sell at least nine (9) cars per month.

"demonstrator rides" and to accompany the customers during such rides; and

8. The employee's use of the demonstrator vehicle was "at the sole discretion of Martin [Chevrolet]."

Beattie executed a Demonstrator Agreement on December 19, 1989, and was subject to its terms at the time of the accident. The parties agree that Beattie was using his demonstrator vehicle to travel to a vacation destination when the accident occurred. Martin Chevrolet contends that Beattie's use of the demonstrator vehicle for a personal vacation was in clear violation of the express terms of the Demonstrator Agreement. In response, Asplundh and Boyles point to deposition testimony of Martin Chevrolet employees, including Beattie, to the effect that the "personal use" restriction in the Demonstrator Agreement was never enforced. In any event, regardless of Beattie's purpose for operating the vehicle on any given occasion, both parties agree that the Demonstrator Agreement contemplated that Beattie would operate the demonstrator vehicle on public roadways so that potential customers, upon seeing the demonstrator vehicle, might be enticed to purchase or lease a similar vehicle from Martin Chevrolet.

## DISCUSSION

### A. Summary Judgment Standard

■ When considering a motion for summary judgment, the Court's function is to examine the record to determine whether genuine issues of material fact exist.[4] If, after viewing the record in a light most favorable to the non-moving party, the Court finds that there are no genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law, summary judgment will be granted.[5]

■ Summary judgment will not be granted, however, if the record indicates that a material fact is in dispute, or if judgment as a matter of law is not appropriate.[6]

### B. Strict Liability In Delaware

■ That a manufacturer of a defective product may be held liable in tort to those injured by the product even absent fault is a concept well-known to Delaware courts.[7] The purpose of strict liability is to ensure "that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves."[8] Since strict liability first was recognized in *Hearn Bros.*, "the doctrine has been in a constant state of extension and refinement."[9]

In *Martin*, the court determined that strict liability will apply in instances where a defective product is "place[d] in circulation" by means of a lease or bailment

**4.** *Oliver B. Cannon & Sons, Inc. v. Dorr–Oliver Inc.*, Del.Super., 312 A.2d 322, 325 (1973).

**5.** *Id.*

**6.** *Ebersole v. Lowengrub*, Del.Supr., 180 A.2d 467, 470 (1962).

**7.** *See Jackson v. Hearn Bros. Inc.*, Del.Supr., 212 A.2d 726 (1965)(recognizing the viability of a cause of action for strict liability in tort);

*Martin*, 353 A.2d at 584 (noting that "strict tort liability" had become "the prevailing remedy throughout the country" in products liability cases).

**8.** *Id.* at 585 (citation omitted).

**9.** *Golt v. Sports Complex, Inc.*, Del.Super., 644 A.2d 989, 991 (1994) (citing *Martin*, 353 A.2d at 586).

transaction.[10] The court was persuaded that the Uniform Commercial Code, 6 *Del. C.* § 2–101, *et seq.*, did not preempt strict liability in the context of lease or bailment transactions because it did not apply to such transactions.[11] *Martin* reserved for another day an answer to the question of whether the Uniform Commercial Code provided the exclusive remedy for individuals injured by defective products distributed to the public in sales transactions.[12]

The question passed over in *Martin* was addressed four years later by an *en banc* Delaware Supreme Court.[13] In *Cline*, the court held that the Uniform Commercial Code preempted strict liability in "sale of goods" transactions.[14] The court clearly stated, however, that its decision in *Martin* was preserved intact because "the U.C.C. makes no reference to a bailment-lease." [15]

Delaware courts have been faithful to the distinction between sales transactions and lease/bailment transactions when determining whether to allow a claim for strict liability to survive summary judgment.[16] Delaware courts have not, however, addressed the question of whether

strict liability should apply when defective goods are placed in circulation for public consumption by means of a transaction which is neither a sale of goods nor a lease/bailment. In keeping with the "step-by-step" development of the doctrine of strict liability, and the "steady and consistent expansion" of the doctrine in the common law,[17] the Court will address this issue in the context of the transaction memorialized in Martin Chevrolet's Demonstrator Agreement.

## C. The Demonstrator Agreement Is Neither A Lease Nor A Bailment.

■ The parties agree that the Demonstrator Agreement does not provide for the sale of goods. Their interpretation of the transaction is well founded in the Uniform Commercial Code, specifically, 6 *Del. C.* § 2–106(1), which provides: "A 'sale' consists in [sic] the passing of title from the seller to the buyer for a price." The Demonstrator Agreement clearly reflects that title to the demonstrator vehicle did not pass from Martin Chevrolet to Beattie. Uniform Commercial Code preemption, therefore, is not an issue in this case.[18]

---

10. *Martin*, 353 A.2d at 587.

11. *Id.* at 584.

12. *Id.* at 584 n. 7.

13. *Cline v. Prowler Indus. of Md., Inc.*, Del. Supr., 418 A.2d 968 (1980).

14. *Id.* at 980.

15. *Id.*

16. *See. e.g., Golt*, 644 A.2d at 991 (recognizing the distinction); *Sage v. James Julian, Inc.*, Del.Super., C.A. No. 87C–NO–180, 1990 WL 140076, Babiarz, J, Mem. Op. at 3. (Sept. 13, 1990) (same).

17. *Martin*, 353 A.2d at 584, 586.

18. The Court is compelled to recognize an issue which has been identified but not decided by this Court, namely, whether strict liability has been preempted in the lease context by the adoption in 1992 of Article 2A of the Uniform Commercial Code governing leases of goods. 6 *Del. C.* § 2A–101, *et seq.; Golt*, 644 A.2d at 991 n. 1 (recognizing but not deciding the question because the transaction at issue predated the adoption of Article 2A and, moreover, neither party claimed that the transaction was a lease). Here, third-party plaintiffs have urged the Court to conclude that the Demonstrator Agreement reflects a lease transaction. As discussed below, the Court does not agree with this characterization of the transaction. And, in any event, the Demonstrator Agreement executed by Beattie predates Article 2A. Accordingly, the Court will not confront the issue of a Uniform Commercial Code preemption in the lease context today. The appropriate case to do so will come along soon enough.

█ The Court next considers whether the Demonstrator Agreement is a lease. "A lease is a contract by which one person divests himself of, and another takes the possession of [property] ... for a term, whether long or short."[19] Implicit in the lease agreement, then, is a specific term, regardless of duration, and a divestiture of property by the lessor during that term.[20] The Demonstrator Agreement does not satisfy these criteria. It neither specifies a term, nor does it require Martin Chevrolet to divest itself of control over the demonstrator vehicle. Accordingly, the Demonstrator Agreement is not a lease agreement.

█ The question of whether the Demonstrator Agreement creates a bailment is more complicated. "A bailment arises when one party delivers property to another for some purpose after which the property will be returned to the original party."[21] This definition of bailment fits the Demonstrator Agreement nicely. Martin Chevrolet delivered the demonstrator vehicle to Beattie for the purpose of allowing Beattie to drive it, and to demonstrate it to potential customers, with the expectation that Beattie ultimately would return the demonstrator vehicle to Martin Chevrolet if he didn't sell it first.

Delaware courts have recognized additional elements of a bailment when analyzing the applicability of strict liability. Specifically, the Supreme Court has noted that a bailment occurs only if both possession *and* control of the property are transferred to the bailee.[22] While Martin acknowledges that it transferred temporary possession of the demonstrator vehicle to Beattie, it argues that it did not transfer possession without recourse, nor did it transfer control of the vehicle to Beattie. The Court agrees. Like the amusement park bailor in *Golt,* who relinquished possession of go-carts after the bailee took the go-carts to the race track, Martin Chevrolet was unable to retake possession of the demonstrator vehicle once Beattie was operating it on the roadway.[23] Unlike the bailment recognized in *Golt,* however, Martin Chevrolet was authorized to retake possession of the demonstrator vehicle "at its sole discretion" without Beattie's consent, even if Beattie was using the vehicle in compliance with the Demonstrator Agreement.[24] Under these circumstances, the Court is unable to conclude that the Demonstrator Agreement is a bailment, as that term has been defined by Delaware courts.[25]

**19.** *Lewes Sand Co. v. Graves,* Del.Supr., 8 A.2d 21, 24 (1939) (citation omitted). *See also,* 6 *Del. C.* § 2A–103(1)(j)("'Lease' means a transfer of the right to possession and use of goods for a term in return for consideration").

**20.** *Lewes Sand,* 8 A.2d at 24.

**21.** *Golt,* 644 A.2d at 992 (citing *Lee Tire and Rubber Co. of the State of N.Y. v. Donner,* Del.Supr., 108 A.2d 168, 170–71 (1954)).

**22.** *Lee Tire,* 108 A.2d at 170. *See also, Golt,* 644 A.2d at 992(noting that "[a]s long as the bailee uses the chattel for the intended pur-

poses of the bailment, the bailor cannot retake possession of the chattel without the bailee's consent").

**23.** *Golt,* 644 A.2d at 992–93 (finding that amusement operator transferred possession and control of go-cart to patrons once patrons began to operate the go-carts on the track in compliance with the terms of the bailment).

**24.** *See id.* (court found that amusement park operator could not interrupt use of go-cart by bailee unless bailee was operating go-cart in a manner which violated the user agreement).

**25.** *Id.; Lee Tire,* 108 A.2d at 170.

## D. The Demonstrator Vehicle Was Supplied To Beattie For The Purpose Of Promoting The Sale Or Lease Of New And Used Cars

█ The fact that the Court has determined that the Demonstrator Agreement is not a lease or bailment does not end the inquiry. In keeping with the "constant extension and refinement"[26] of the doctrine of strict liability in the common law, the Court must determine whether the transaction embodied in the Demonstrator Agreement, however it may be characterized, should give rise to strict liability when a defective demonstrator vehicle causes injury. In this regard, the Court has followed a Delaware jurisprudential tradition of seeking guidance from the most recent pronouncements of the Restatement of Torts.[27]

The American Law Institute adopted and promulgated the Restatement (Third) of Torts: Products Liability ("Restatement Third") on May 20, 1997. As its name suggests, the Restatement Third addresses specifically the law of products liability, including the doctrine of strict liability. Restatement Third § 1 generally defines the doctrine of strict liability: "One engaged in the business of selling or *otherwise distributing* products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect." (emphasis supplied) The Restatement Third explains the term "otherwise distributes" at § 20(b):

One otherwise distributes a product when, in a commercial transaction other than a sale, one provides the product to another either for use or consumption or as a preliminary step leading to ultimate sale or consumption. Commercial non-sale product distributors include, but are not limited to, lessors, bailors, *and those who provide products to others as a means of promoting either the use or consumption of such products or some other commercial activity.* (emphasis supplied)

As Martin Chevrolet candidly has conceded, the transaction reflected in the Demonstrator Agreement is captured clearly within the definition of "otherwise distributes" as used in §§ 1 and 20(b). Martin Chevrolet provided the demonstrator vehicle to Beattie not only as a perquisite of employment; it also intended that Beattie would use the demonstrator vehicle to showcase the new and used vehicles Martin Chevrolet had available for sale or lease. In this regard, Martin Chevrolet contemplated that Beattie would either operate the demonstrator vehicle on public roadways where it could be seen by potential customers, or he would allow potential customers to take "demonstrator rides" in the vehicle. In both instances, the demonstrator vehicle was "placed in circulation" by Martin Chevrolet in such a manner that, if defective, it could injure both passengers and bystanders.[28] Under these circumstances, the extension of strict lia-

---

**26.** *Golt,* 644 A.2d at 991 (citation omitted).

**27.** *See, e.g., Fox. v. Fox,* Del.Supr., 729 A.2d 825, 826 (1999)(applying § 339 of the Restatement (Second) of Torts); *Furek v. University of Delaware,* Del.Supr., 594 A.2d 506, 520 (1991)(applying § 323 of the Restatement (Second) of Torts); *Naidu v. Laird,* Del.Supr., 539 A.2d 1064, 1072 (1988)(applying § 315 of the Restatement (Second) of Torts); *DiOssi v. Maroney,* Del.Supr., 548 A.2d 1361 (1988)(applying § 343 of the Restatement (Second) of Torts); *Martin,* 353 A.2d at 582 n. 2 (applying § 402A of the Restatement (Second) of Torts); *Motion Picture Mach. Projectionists Protective Union, Local No. 473 v. Rialto Theatre Co.,* Del.Supr., 17 A.2d 836, 842 (1941)(applying § 776 of the Restatement of Torts).

**28.** *See Martin,* 353 A.2d at 587–88 (recognizing that strict liability will apply when defective products, "placed in circulation" by a bailor or lessor, injure users *or* bystanders).

bility to Martin Chevrolet for defective demonstrator vehicles it places in circulation is appropriate.[29]

Martin Chevrolet has urged the Court to reject § 20(b) of the Restatement Third because its application in this case would countenance a result where an automobile dealership could be strictly liable for defects in a demonstrator vehicle, but could not be strictly liable for defects in the same vehicle after it is sold. While the argument has intuitive appeal, it fails for the simple reason that consumers who purchase (or, for that matter, lease) defective demonstrator vehicles have a full compliment of remedies available to them under the Uniform Commercial Code. These remedies are available even if the consumer cannot prove negligence on the part of the dealership. On the other hand, absent strict liability, those injured by demonstrator vehicles are left to negligence-based remedies only; the Uniform Commercial Code does not protect them. In this respect, the analysis here mirrors the analysis in *Martin*, where the court recognized that those injured by defective products placed in circulation by bailment or lease transactions have little recourse absent strict liability since the warranty provisions of the Uniform Commercial Code would not apply.[30]

The Court also rejects Martin Chevrolet's contention that the Court's holding today will extend strict liability to all businesses which supply the so-called "company car" to their employees. Only in those limited instances where the company car is supplied to promote the sale of the vehicle, or similar vehicles, will strict liability apply. There is no "slippery slope" problem here because the Restatement Third, upon which the Court's holding relies, clearly limits the extension of strict liability to "sellers or other distributors" of defective products.

Finally, the Court finds unpersuasive Martin Chevrolet's effort to convert a matter of semantics into a substantive basis to reject strict liability in this case. Specifically, Martin Chevrolet has argued that strict liability cannot apply here because it did not place its demonstrator vehicles into the "stream of commerce" which, it contends, is a predicate to strict liability. The argument misses the mark for two reasons. First, placement of a defective product into the "stream of commerce" is not, in Delaware, the only trigger for the application of strict liability.[31] Second, it appears that the argument is really a matter of extraneous semantics. Whether the defective product is "placed in the stream of commerce", placed "on the market", or "placed in circulation", the predicate for strict liability remains the same: strict liability will apply when a consumer or bystander is injured by a defective product when such consumer or bystander is exposed to the defective product by the actions of "one engaged in the business of selling or otherwise distributing products" and the injured party is not eligible for recourse in statutory remedies.

The Court takes comfort in the fact that the public policy considerations which

---

29. *See Robert F. Bullock, Inc. v. Thorpe*, 256 Ga. 744, 353 S.E.2d 340, 341–42 (1987)(finding strict liability applicable to a manufacturer which supplied a deep fryer to restaurant on a "try-out" basis when alleged defects in the fryer caused injury to restaurant employee); *Delaney v. Towmotor Corp.*, 2d. Cir., 339 F.2d 4, 6 (1964)(finding strict liability applicable to "demonstrator" transaction).

30. *Martin*, 353 A.2d at 587–88.

31. *Id.* at 587 ("damages arising from the use of a defective [product] should be borne by the party who *placed it in circulation*, who is best able to prevent *distribution of a defective product* . . .")(emphasis supplied); *Golt*, 644 A.2d at 991 (applying strict liability to bailor who put defective products "on the market").

were articulated in *Martin* as support for the extension of strict liability there have equal application here. First, the "cost of compensating for injuries and damages arising from the use of a defective [demonstrator] vehicle should be borne by the party who placed it in circulation [Martin Chevrolet], who is best able to prevent distribution of a defective product, and who can spread the cost as a risk and expense of the business enterprise." [32] Second,. the Court concludes that the demonstrator vehicle "was placed on the highways in [alleged] violation of a representation of fitness by [Martin Chevrolet] implied by law from the circumstances and trade practices of the business." [33] In this regard, the Court reiterates that Martin Chevrolet engaged in the practice of supplying demonstrator vehicles to its staff with the expectation that doing so would facilitate the ultimate sale or lease of the vehicle or similar vehicles. The Court concludes, therefore, that Martin Chevrolet represented to the general public, including Mrs. Beattie, that the vehicle was fit for its intended purpose. Lastly, the extension of strict liability upon Martin Chevrolet under the circumstances *sub judice* "will result in general risk-reduction by arousing in [Martin Chevrolet] an additional impetus to furnish safer vehicles." [34]

### E. Third–Party Plaintiffs May Amend Their Pleadings In Conformity With This Decision.

Third-party plaintiffs based their claim of strict liability upon the contention that Martin Chevrolet leased the demonstrator vehicle to Beattie. The Court has rejected this contention. Martin Chevrolet has argued, therefore, that the Court should end its analysis with the finding that the transaction is not a lease because this is the only basis for relief plead in the third-party complaint. Having rejected third-party plaintiffs' characterization of the operative transaction, Martin Chevrolet contends that the Court must grant the motion for summary judgment. Third-party plaintiffs have requested leave to amend their pleading in order to characterize the Demonstrator Agreement as something other than a lease.

"[A]mendments to pleadings are to be fully allowed in the absence of prejudice to the opposing party." [35] It is particularly appropriate to amend pleadings so that they will conform to the evidence developed during discovery or at trial.[36] An amendment to a pleading will "relate back" to the date of the initial pleading for statute of limitations purposes when the claim arises out of the conduct or occurrence set forth in the original pleading.[37]

Third-party plaintiffs will be permitted to file a second amended pleading to conform to the Court's ruling on Martin Chevrolet's motion for summary judgment. The first amended third-party complaint clearly describes the nature of the transaction facilitated by the Demonstrator Agreement and alleges, based on that

---

32. *Martin*, 353 A.2d at 587.

33. *Id.*

34. *Id.*

35. *Chrysler Corp. v. New Castle County*, Del.Super., 464 A.2d 75, 84 (1983) (citation omitted).

36. Del.Super. Ct. Civ. R. 15(b); *Garrod v. Good*, Del.Supr., 203 A.2d 112 (1964).

37. Del.Super. Ct. Civ. R. 15(c)(2); *Mullen v. Alarmguard of Delmarva, Inc.*, Del.Supr., 625 A.2d 258 (1993).

transaction, that Martin Chevrolet is strictly liable for defects in the design of the demonstrator vehicle operated by Beattie at the time of the accident. That third-party plaintiffs mischaracterized the transaction as a lease is of little consequence. Martin Chevrolet was on notice of the factual basis (the Demonstrator Agreement) and the legal basis (strict liability) for the third-party claim from the initial pleading. The proposed amendments will simply "clean up" the third-party complaint to conform to the evidence.

### CONCLUSION

■ The Court has extended the doctrine of strict liability to those who distribute defective products in nonsale transactions which are neither leases nor bailments where the products are provided to others as a means of promoting either the use or consumption of such products or some other commercial activity. Martin Chevrolet's Demonstrator Agreement transferred possession of an allegedly defective demonstrator vehicle to Beattie for the purpose of promoting the sale or lease of the vehicle or others like it. To the extent third-party plaintiffs prove at trial that the demonstrator vehicle was, in fact, defective, Martin Chevrolet will be strictly liable for damages proximately caused by such defect(s). These are issues of fact for a jury to decide. Accordingly, Martin Chevrolet's motion for summary judgment must be **DENIED.**

### *O R D E R*

This 1st day of February, 2001, for the reasons expressed in the Court's Opinion issued this date,

**IT IS ORDERED** that Third Party Defendant, Martin Chevrolet–Buick, Inc.'s Motion for Summary Judgment is **DENIED,** and

Third Party Plaintiffs' Motion for Leave to File a Second Amended Third Party Complaint is **GRANTED.** The Second Amended Third Party Complaint shall be filed within 15 days of the date of this Order.